UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEGAN H.,[1] | ) |
|               Plaintiff, | ) No. 23 CV 169 |
| v. | ) Magistrate Judge Young B. Kim |
| FRANK BISIGNANO, Commissioner of Social Security, | ) |
|               Defendant. | ) February 11, 2026 |

**MEMORANDUM OPINION and ORDER**

Megan H. seeks social security and disability insurance benefits ("SSI" and "DIB," respectively), asserting that she is disabled by mental health conditions, as well as physical conditions not relevant here. She brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her applications for benefits. For the following reasons, Megan's remand request is granted:

**Procedural History**

Megan filed SSI and DIB applications in August 2019 claiming disability onset on January 2, 2013. (Administrative Record ("A.R.") 264.) For her SSI claim, Megan was found disabled on reconsideration at the administrative level as of August 21, 2019, (id. at 14, 353-66), but her DIB claim was denied, (id. at 318-28, 344-52). Megan sought and was granted a hearing before an Administrative Law Judge ("ALJ") as to

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Megan's first name and last initial in this opinion to protect her privacy to the extent possible.

her DIB claim where she, her therapist Emmaline Logman, and a vocational expert ("VE") testified. (Id. at 281-317, 376-77, 414.) The ALJ found in June 2021 that Megan's date last insured for purposes of her DIB claim is December 31, 2018, and that while Megan suffers from severe PTSD, depression, anxiety, and alcohol dependence, as well as non-severe asthma and back pain, she is not disabled. (Id. at 264-75.) In her decision the ALJ also purported to reverse the favorable administrative-level ruling on Megan's SSI claim, having concluded that she was not disabled through the date of that decision. (See id.) But because Megan did not seek a hearing on her SSI claim, (id. at 376-77), the Appeals Council concluded that the favorable decision on Megan's SSI claim stands as the final decision of the Commissioner, (id. at 10-11). However, the Appeals Council denied Megan's request for review of the ALJ's unfavorable decision on her DIB claim, (id. at 1-7), and Megan filed this action for judicial review of that decision. The parties then consented to this court's jurisdiction. 28 U.S.C. § 636(c); (R. 9).[2]

---

[2] Unlike the SSI benefit program, which is need-based and not connected to a claimant's work history, a claimant is eligible for DIB benefits only if she becomes disabled while insured, as determined by past earnings. *See Liskowitz v. Astrue*, 559 F.3d 736, 739-40 & n.2 (7th Cir. 2009). Generally, an eligible claimant may receive DIB benefits for a period preceding the filing of her DIB application, whereas SSI benefits are awarded beginning as of the date of the SSI application. *See generally Martin v. Kijakazi*, 88 F.4th 726 (7th Cir. 2023) (affirming denial of DIB benefits despite approval for SSI benefits where claimant failed to establish disability before date last insured). Under certain circumstances, where the claimant's DIB payment is low, the claimant may receive DIB and SSI benefits concurrently, if otherwise eligible. *See* 42 U.S.C. § 1320a-6 (claimant can receive SSI benefits in addition to DIB benefits where the latter alone would not meet a certain minimum threshold).

**Analysis**

Megan argues that the ALJ erred when: (1) assessing her subjective symptoms; (2) evaluating the opinion evidence; and (3) setting her residual functional capacity ("RFC"). (See generally R. 17, Pl.'s Mem.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021), and "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow [the] reviewing court[ ] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review,'" *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). Viewing the record under this standard, remand is warranted here.

**A.    Subjective Symptom Assessment**

The court turns first to Megan's complaints about the ALJ's subjective symptom assessment because errors here impact the remainder of the ALJ's analysis.

3

An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). But the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and must consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). That said, the court will not disturb a symptom evaluation that is logically based on specific findings and evidence. *See Murphy*, 759 F.3d at 815. Here, the ALJ's assessment fails to meet this standard.

Megan says that the ALJ impermissibly cherry-picked evidence to support the conclusion that she is not disabled, highlighting unremarkable mental status examinations ("MSEs") while "neglect[ing] to mention overwhelming findings to the contrary." (R. 17, Pl.'s Mem. at 7.) At the outset, Megan points out that when assessing her symptom allegations, the ALJ failed to consider both her December 2018 hospitalization where she was diagnosed with alcohol withdrawal, alcoholism, and depression, and her completion of an 8-week residential program in March 2019, after which she received group therapy for anxiety at the same facility. (Id. at 8.) Megan also notes that examinations reflect anxious and depressed mood, sad affect, and poor impulse control "[t]hroughout the relevant period," for which her medical provider prescribed a "variety of psychotropic medications." (Id.) Finally, Megan asserts that the almost unanimous medical opinion evidence supporting the severity of her mental health conditions translates to significant functional limitations. (Id.)

4

The court addresses the opinion evidence separately below. For now, the court focuses on the government's response, which asserts that the ALJ offered "numerous specific reasons" for discounting Megan's mental health symptoms, even though the ALJ relied almost exclusively on her MSEs and activities of daily living. (R. 23, Govt.'s Mem. at 3-4; A.R. 271-72.)

First, while the ALJ characterizes Megan's MSEs as "frequently," "mostly," or "often" normal or unremarkable, she cites just two records each from 2012 and 2019, and one from 2021. (See A.R. 271-73 (citing id. at 596, 624, 752 (duplicate), 780 (duplicate), 960, 1240, 1599-1600).) And when assessing Megan's symptom statements, the ALJ fails to discuss evidence indicating that Megan's MSEs are abnormal. (See generally id. at 271.) Nor does the ALJ acknowledge that a person experiencing mental illness will, as Megan's MSEs reflect, have both good and bad days and symptoms that wax and wane. *Phillips v. Astrue,* 413 Fed. Appx. 878, 886 (7th Cir. 2010) (holding that "[t]he ALJ's assessment of the medical record . . . demonstrates a misunderstanding about the nature of mental illness," many of which "are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms"). As Megan correctly points out, various MSEs and accompanying provider notes reflect abnormalities. (See R. 17, Pl.'s Mem. at 8; see also A.R. 1227 (April 2019 MSE reflecting "angry" mood, "constricted" affect that "increased in intensity," and "fair" insight and judgment), 1539-45 (summary of MSEs from September 2019 to May 2020 reflecting Megan had "fair" judgment and insight, experienced "worry a lot, sleep disturbance, restlessness,

5

irritability, [and] many physical complaints," and was anxious, sad, and disheveled), 1581 (November 2020 visit reflecting Megan had "deteriorated" and was experiencing "increased irritability, anger, and inability to sleep").) And while the ALJ mentioned two such records earlier in her decision, (see A.R. 270 (citing id. at 1303 (March 2021 therapy note indicating poor impulse control, impaired memory, anxious, depressed, and labile mood, sad affect, fair insight, "memory issues . . . related to an increase in anxiety, depression, and sleep issues," and an inability to recall the date), and 1538 (one page of multi-page summary of Megan's MSEs from September 2019 to March 2021 reflecting "fair" judgment and insight and depressed mood in May 2020)), she made no attempt to reconcile them with her subjective symptom assessment.

Nor did the ALJ consider aspects of the few records she cited that ran contrary to her conclusions regarding the same. (See, e.g., id. at 270 (citing id. at 1240 as reflecting normal MSE but omitting that Megan reports a "massive amount of rage" and "chronic anger" with "many triggers," even while condition was improving, and that the same exam reflects "fair" insight and judgment and a GAF score indicating "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning", and id. at 624 as reflecting normal MSE but failing to mention therapist's opinion that Megan's "memory and judgment may be impaired when her symptoms increase" and that Megan rated her mental health as "poor").) This selective citation matters, especially because if "half the time [Megan] is well enough [to] work, and half the time she is not," she "could not hold down a fulltime job." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). Thus, the ALJ erred in discounting

6

Megan's credibility based on selective citations to only a handful of MSEs. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (holding that ALJs may not "'cherry-pick' from . . . mixed results to support a denial of benefits"); *see also Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports . . . but must consider 'all relevant evidence.'"); *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (holding that ALJ improperly overemphasized MSEs since they described only how claimant presented *"on the days of her appointments,"* and were not "general assessments" (emphasis in original)).

The ALJ's reliance on Megan's activities of daily living is also flawed. In concluding that Megan is "not as limited as alleged," the ALJ briefly note that Megan prepared meals, performed household chores, read, used social media, cared for pets, shopped, maintained a relationship, and moved during the relevant period, and then spent a paragraph emphasizing that Megan continues to drive. (A.R. 271.) The ALJ described driving as a "very dynamic" and "complex" task made up of "strategic" and "continuous decisions/judgment calls" requiring "social interaction" and the "ability to multitask while dealing with external and internal stimuli." (Id.) Even assuming that were true, the ALJ made no effort to connect Megan's ability to drive with her capacity to perform full-time work within the RFC assessed. (Id.) Further, in highlighting that Megan maintained a relationship and moved during the relevant period, the ALJ failed to note that the relationship was violent and Megan moved to be closer to her sister for help with her daily activities. (Id. at 301-03.)

7

While the ALJ's fixation on Megan's driving and incomplete discussion of her other activities alone may not compel a remand, *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2019) (holding that not all of an ALJ's reasons for discounting subjective symptoms must be valid "as long as *enough* of them are" (emphasis in original)), taken together with the ALJ's failure to confront evidence conflicting with her conclusion, this court has no choice but to remand this case, *see Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) ("Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion" and "may not ignore entire lines of contrary evidence."). On remand, the ALJ should also consider whether and how Megan's December 2018 hospitalization and March 2019 residential program—both apparently for alcohol detoxification, (A.R. 302)—factor into her symptom assessment.

### B.   Opinion Evidence

The ALJ's treatment of the opinion evidence is also problematic. An ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, she must assess the persuasiveness of all medical opinions by considering and explaining the most important factors—supportability and consistency. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires consideration of the objective medical evidence and explanations presented and used by the medical source, 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), while the consistency factor directs the ALJ to assess how the opinion

8

is consistent with all other medical and nonmedical sources, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ also may, but is not required to, explain how she considered the medical source's specializations and relationship with the claimant and any other factors that tend to support or contradict the source's opinion. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2).

Here, the ALJ rejected all mental health opinions when formulating the RFC, deeming those of the state agency psychological consultants, the consultative examiner, and Megan's therapist "unpersuasive." (A.R. 272-73.) In doing so, the ALJ did not acknowledge that all opinions except that of the initial state agency consultant—who opined Megan's conditions were non-severe—reflect consistent and dramatic findings. Indeed, consultative examiner Dr. Mark Amdur opined in October 2020 that Megan: (1) suffers from major depression and anxiety with bipolar disorder being a possible "alternative diagnosis"; (2) tolerates interview stress "very poorly" and could not tolerate work stress; (3) cannot reliably report to work because of depressive withdrawal and would be slowed by cleanliness preoccupations and compulsions even if she could do so; and (4) cannot manage her own funds. (Id. at 1200-01.) Dr. Amdur also noted that during the exam Megan was "markedly tense and anxious," exhibited marked social phobia or social anxiety with withdrawal and avoidance, had "difficulty focusing," and demonstrated moderate or moderately severe cognitive impairment on the Montreal Cognitive Assessment ("MoCA") because of anxiety. (Id.) Similarly, state agency psychologist Dr. Jeanne Yakin opined that same month that Megan: (1) is markedly limited in all four paragraph B

9

criteria; (2) suffers "significant" overall impairment; (3) cannot focus "for any substantial length of time;" and (4) cannot perform "even basic work-related duties" in an "unskilled work environment." (Id. at 358-63.) Among other things, Dr. Yakin reviewed Megan's therapy records and consultative examination, which she found consistent with Megan's allegations. (Id. at 358-61.)

Finally, Megan's therapist since March 2019, Emmaline Logman, opined in November 2020 that Megan has been "incapacitated" since October 2014 with "significant barriers" in daily functioning. (Id. at 551.) According to Logman, Megan feels hopeless and worthless and is often bedridden because of depression, which delays treatment for her medical needs. (Id.) Logman also reported that Megan suffers from anxiety-associated restlessness, concentration issues, irritability, insomnia, and rocking and psychomotor agitation, and that she needs "support and redirection from staff" to "comprehend information." (Id.) Further, Logman observed that Megan's PTSD and borderline personality disorder—a more recent diagnosis— cause distrust, emotional dysregulation, impulsivity, and a "pattern of overattachment and then detachment" that prevent her from forming "constructive relationships" and interacting with others. (Id. at 552.) She concluded that Megan has made progress but still cannot manage her symptoms. (Id.)

Rather than acknowledging the consistent nature of these medical opinions and explaining whether and how they affected her decision, the ALJ pointed to the same handful of MSEs discussed above to justify her rejection of all opinions. (Id. at 272-73.) In so doing, the ALJ again failed to assess the aspects of those same records

10

and other unreferenced MSEs that bolstered the opinions she rejected. The ALJ also neglected to explain whether or how Megan's MoCA score at the consultative examination or the favorable aspects of Logman's treatment notes factored into her assessment. *See Cain v. Bisignano*, 148 F.4th 490, 497 (7th Cir. 2025) (holding that the ALJ must "confront the evidence that does not support [her] conclusion and explain why it was rejected" in assessing opinion evidence (quoting *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018))). In fact, the ALJ glossed over Logman's opinions altogether, reporting only her observation that Megan had been unable to work since 2014, which the ALJ notes infringed on a matter reserved for the Commissioner. (A.R. 272.) Maybe so, but this court agrees with Megan that this finding does not negate the other opinions and information Logman rendered, nor does it justify the ALJ's failure to assess them. (R. 17, Pl.'s Mem. at 11-12.)

In addition to the limited MSEs she referenced, the ALJ also noted that Megan sought only "minimal" treatment and that she felt more stable after she began taking a new medication in June 2020. (A.R. 272.) But symptom improvement 18 months after Megan's date last insured says little about whether she could sustain work at that time, let alone during the relevant period. *Scott*, 647 F.3d at 739 ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."). And in characterizing Megan's treatment as "minimal," the ALJ neglected to fairly describe her treatment or the reasons Megan did not obtain more. (A.R. 272.) To be sure, the ALJ mentioned in passing that Megan had a therapist and had been prescribed various medications for her mental health

11

conditions, but did not explain that Megan had seen Logman for therapy once or twice a week since Spring 2019, attended intermittent therapy with other providers from 2017 to 2019, or that during a gap in treatment from late 2015 to 2017 she "barely got out of bed," was "afraid to go outside," and "rarely went out of the house," all while taking psychotropic medication as prescribed by her primary care provider. (Id. at 300, 307); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (remanding where ALJ failed to consider possible explanations for non-compliance other than that claimant did not require treatment); *Kangail v. Barnhart*, 454 F.3d 627, 629-31 (7th Cir. 2006) (remanding where ALJ did not consider that "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment"). In sum, the ALJ failed to sufficiently address the two required factors—consistency and supportability—and unfairly characterized the record when assessing the opinion evidence.

C.    **RFC Assessment**

Finally, Megan argues that remand is proper because the ALJ's RFC assessment: (1) is based on flawed findings at steps two and three; (2) did not include a more detailed assessment of the paragraph B criteria as promised; and (3) failed to account for all of Megan's functional limitations, particularly as they relate to off-task time and absences. (R. 17, Pl.'s Mem. at 12-15.) An RFC measures the tasks a person can perform given her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When developing the RFC, the ALJ must incorporate a

12

claimant's limitations, including those that are not severe, and may not dismiss a line of evidence that is contrary to the ruling. *Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020). In so doing, the ALJ must "say enough to enable review of whether she considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), providing a "logical bridge" between the evidence and her conclusions, *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

The ALJ here found Megan capable of medium work with postural and environmental limitations, and added that Megan can "understand, remember, and carry out instructions for simple, routine repetitive tasks," cannot engage in "fast paced production rate or strict quota requirements but can meet end of day requirements," may have only "occasional contact with coworkers, supervisors and general public," and "no group tandem or team work and no problem solving tasks with general public." (A.R. 269.) Megan argues that the ALJ erred at step 2 when she found her only moderately limited in the paragraph B criteria of interacting with others and concentrating, persisting, or maintaining pace ("CPP"), and mildly limited in understanding, remembering, or applying information and adapting or managing oneself. (R. 17, Pl.'s Mem. at 12-15 (citing A.R. 268).) This in turn led to her conclusion that Megan's conditions were not listings-level severe and ultimately resulted in an improper RFC assessment. (Id.)

The government responds that when assessing Megan's paragraph B limitations, the ALJ relied on the fact that Megan's statements about her level of functioning were sometimes inconsistent. (R. 23, Govt.'s Mem. at 9-10 (citing

13

A.R. 268).) But the ALJ referenced only one document—an October 2019 function report—for support and ignored the opinion and other contrary evidence mentioned above. The government also says that the ALJ need not include off-task time or account for absences in the RFC even though she did so in a hypothetical to the VE. (Id. at 10-12.) True, but the underlying issue here is that the ALJ failed to engage with the opinion and other evidence showing that Megan cannot reliably leave home for work, suffers significant concentration problems, and cannot perform even the most basic work tasks. In short, because the ALJ's subjective symptom assessment, opinion evidence evaluation, and RFC assessment are inextricably intertwined, the court cannot trace the ALJ's path of reasoning in finding that Megan suffered at most moderate paragraph B limitations and can sustain full-time work under the RFC assessed. While the court makes no prediction about the outcome following remand, it is duty-bound to ensure it is based on substantial evidence.

## Conclusion

For the foregoing reasons, Megan's remand request is granted, and this matter is remanded for further proceedings consistent with this opinion.

                              **ENTER:**

                              **Young B. Kim**
                              **United States Magistrate Judge**